# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RUSSELL BATTIATO,** | : | **No. 1:08cv1786** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **HARLEY-DAVIDSON MOTOR** | : | |
| **COMPANY;** | : | |
| **JOHN DOES 1-10;** | : | |
| **ABC CORPORATIONS 1-10;** | : | |
| **DEF COMPANIES; and** | : | |
| **XYZ PARTNERSHIPS** | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Before the court is defendant Harley-Davidson Motor Company's motion for summary judgment. (Doc. 40). Having been fully briefed and argued, the matter is ripe for disposition.

## Background

This case concerns alleged manufacturing and design defects in the "jiffy stand" on plaintiff's 1992 Harley-Davidson Sportster motorcycle. Plaintiff contends that the stand malfunctioned, causing the motorcycle to tip over on top of him and injure his leg. Plaintiff's business acquired this motorcycle used around the year 2000. (Defendant's Statement of Undisputed Material Facts (Doc. 42) (hereinafter "Defendant's Statement") at ¶ 1); Plaintiff's Response to Defendant's Statement (Doc. 47) (hereinafter "Plaintiff's Response") ¶ 1). Plaintiff began riding the

motorcycle himself, and eventually purchased it from the business. (Defendant's Statement at ¶ 1).

Plaintiff's motorcycle had a "jiffy stand" kickstand, which was designed to hold the bike upright when not being operated. (Id. at ¶ 2). The stand consists of a bracket or yoke, a stand leg, and a spring which attaches to the stand and to an attachment welded onto the motorcycle frame. (Id.). Plaintiff insists that facts about the design of the motorcycle require expert analysis. (Plaintiff's Response at ¶ 2). When the motorcycle is operated, the spring is designed to hold the stand in a fully retracted position against the frame. (Defendant's Statement at ¶ 3). Plaintiff contends that only expert analysis can provide an analysis of the spring's purpose. (Plaintiff's Response at ¶ 3). The stand is placed in the "fully deployed" position when the motorcycle is not being operated. (Defendant's Statement at ¶ 4). The operator then leans the motorcycle to the left, resting its weight on the stand. (Id. at ¶ 5). This action engages the stand's locking tab, which prevents the stand from retracting while the bike is at rest. (Id.).

Defendant contends that the stand's design meets all applicable Federal Motor Vehicle Safety Standards and safety standards from the Society of Automotive Engineers. (Id. at ¶ 6). Plaintiff disputes whether defendant has provided sufficient proof of this claim, since that proof relies on defendant's answers to interrogatories and defendant does not provide independent documentation. (Plaintiff's Response at ¶ 6). Plaintiff also disputes that complying with standards demonstrates that the

design of the jiffy stand was safe and appropriate.  (Id.).

The defendant sold 164,281 Sportster motorcycles between 1989 and 1999. (Defendant's Statement at ¶ 7).  All of them had the same jiffy stand components as the one owned by plaintiff.  (Id.).  Defendant insists that no other Sportsters with a jiffy stand experienced a similar unintentional or unexpected retraction.  (Id. at ¶ 8). Plaintiff contends that in its interrogatories defendant provided evidence of complaints about defects and unexpected retractions with a number of jiffy stands on other Harley-Davidson models.  (Plaintiff's Response at ¶ 8).

The undercarriage of the motorcycle in question sustained damage at some point.  (Defendant's Statement at  ¶ 9).  The parties dispute when this damage occurred.  (Id. at ¶ 9; Plaintiff's Response at ¶ 9).  The impact to the undercarriage of the motorcycle caused the stand's attachment point on the frame to be bent rearward.  (Defendant's Statement ¶ 9).  Plaintiff contends that he was not aware of any damage, though that damage did "[compromise] the functioning of the kickstand."  (Plaintiff's Response at ¶ 9).  The parties dispute how to characterize plaintiff's testimony about the condition of the kickstand.  Defendant argues that plaintiff testified that he had been aware for nearly a year that the stand was operating on a "hair trigger," and retracting more easily than normal.  (Defendant's Statement at ¶ 10).  Plaintiff contends that this mischaracterizes his testimony, which was about a dealer's attempt to fix his problem, and in any case did not refer to a particular time period.  (Plaintiff's Response at ¶ 10).  Plaintiff recognized that his

3

kickstand was a problem, and when defendant's authorized dealer could not fix that problem, he brought the motorcycle to another repairer. (Defendant's Statement at ¶ 11; Plaintiff's Response at ¶ 11). A mechanic examined the motorcycle shortly before the accident here in question. (Defendant's Statement at ¶ 11). The parties agree that the mechanic found a problem with the kickstand, but do not agree about how extensively the mechanic described the problem to plaintiff. (Defendant's Statement at ¶ 12; Plaintiff's Statement at ¶ 12). Defendant contends that plaintiff was aware that the failings of the kickstand could cause injury. (Defendant's Statement at ¶ 13). Plaintiff contends that he testified only that the motorcycle might fall down if the kickstand failed. (Plaintiff's Response at ¶ 13).

On the day of his injury, plaintiff picked up his motorcycle from a repair shop in Dillsburg, Pennsylvania. (Defendant's Statement at ¶ 14). He planned to load the motorcycle onto a trailer. (Id.). Defendant insists that plaintiff noticed a continuing problem with the stand when he picked up the motorcycle. (Id.). Plaintiff disputes the significance of this knowledge, as he contends he was not aware of the risk that the bike would fall over on top of him because of those failings. (Plaintiff's Response at ¶ 14).

Plaintiff rode the motorcycle onto the trailer. (Defendant's Statement at ¶ 15). He turned off the engine and deployed the jiffy stand. (Id.). As he dismounted from the bike, plaintiff reports that he heard the stand retract, and the motorcycle fell over on his leg. (Id.). Plaintiff contends that the accident was caused by the stand

4

retracting improperly as he was getting off the motorcycle. (Id. at ¶ 16). Plaintiff

contends that his injuries were caused by the improper design of the jiffy stand.

(Plaintiff's Response at ¶ 16). He alleges that defendant placed the pin of the stand

assembly on the lowest point of the frame, making the pin susceptible to bending,

which could cause an incident like the one plaintiff experienced. (Id.).

Plaintiff filed the instant complaint in the United States District Court for the

Northern District of New Jersey on June 2, 2006. (See Doc. 1). The complaint

alleges that defendant manufactured and sold a defective product, and that plaintiff

injured himself while using the product as it was designed to be used. Plaintiff

fractured his leg so severely that he was medically discharged from the United

States Army. On October 31, 2006, the district court in New Jersey dismissed the

complaint for failure to prosecute. (Doc. 4). Defendant answered the complaint on

December 11, 2006. (Doc. 5). Because of problems in the office of the lawyer who

filed the case, no action occurred in the matter until June 2008, when plaintiff moved

to reopen the action. (Doc. 7). The court in New Jersey granted this motion. (Doc.

9). The court also agreed to transfer the case to the United States District Court for

the Middle District of Pennsylvania. (Doc. 12). The parties then engaged in

discovery. At the close of discovery, defendant filed the instant motion. The parties

briefed the issues[1], and the court held argument, bringing the case to its present

---

[1]Plaintiff filed a sur reply brief (Doc. 48) without seeking leave of court. Defendant then filed a reply to the sur reply brief, again without seeking leave of court. As these briefs are not proper under the local rules and the court can dispose of the instant motion

posture.

**Jurisdiction**

Plaintiff is a citizen of Pennsylvania. Defendant is a Wisconsin corporation, with its principal place of business in that state. The amount in controversy exceeds $75,000. The court therefore has jurisdiction pursuant to 28 U.S.C. § 1332. The court is sitting in diversity, and therefore the substantive law of Pennsylvania shall apply. Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d Cir. 2000) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938)).

**Legal Standard**

Defendant moves for summary judgment on plaintiff's claims. Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

---

without considering them, the court will ignore them. **The parties are directed not to file additional briefs in the future without seeking leave of court**.

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. International Raw Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson, 477 U.S. at 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex v. Catrett, 477 U.S. 317, 322 (1986).

**Discussion**

Defendant seeks summary judgment on various grounds in this products liability claim. The court will address each in turn. As a preliminary matter, "the Pennsylvania Supreme Court has remained faithful to its view that negligence concepts have no place in a products liability trial." Habecker v. Clark Equip. Co., 36 F.3d 278, 282 (3d Cir. 1994). Thus, "[t]he test for defectiveness is whether the 'product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use.'" Id. (quoting Azzarello v. Black Bros. Co., 391 A.2d 1020, 1027 (Pa. 1978)). To prevail on a products liability claim, a plaintiff must demonstrate "that: (1) the product

was defective, (2) the defect existed while the product was in control of the manufacturer, and (3) the defect was the proximate cause of the injuries." Id. at 284. Pennsylvania courts have found "that a product is defective when it is not fit for the intended use for which it was sold." Colville v. Crown Equip. Corp., 809 A.2d 916, 922 (Pa. Super. Ct. 2002). Further, "'the intended use of a product includes all those [uses] which are reasonably foreseeable to the seller." Parks v. Allied Signal, 113 F.3d 1327, 1331 (3d Cir. 1997) (quoting Pacheco v. Coats Co., Inc., 26 F.3d 418, 422 (3d Cir. 1994)) (internal quotations omitted).

### i. Assumption of Risk

Defendant contends that plaintiff is barred from bringing any sort of a products liability claim under Pennsylvania law because he was aware of the risk that the kickstand caused and used the motorcycle anyway. At his deposition, plaintiff admitted that he knew there was a danger the kickstand would retract at an improper moment. Indeed, plaintiff took the motorcycle to a repair shop shortly before the accident occurred. There, a mechanic told him that the stand was retracting too easily, but plaintiff did not seek repair.

As a general matter, "[e]vidence of a user's negligence cannot be introduced to excuse a defective product, nor can negligence be used to reduce recovery by comparing fault." Madonna v. Harley Davidson, Inc., 708 A.2d 507, 508 (Pa,. Super. Ct. 1998). Still, "[v]oluntary assumption of risk . . . is an affirmative defense in a products liability case." Robinson v. B.F. Goodrich Tire Co., 664 A.2d 616, 618 (Pa.

Super. Ct. 1995). Thus, "a plaintiff is precluded from recovery in a products liability action if he knows of the specific defect eventually causing his injury and voluntarily proceeds to use the product with knowledge of the danger caused by the defect." Kupetz v. Deere & Co., 644 A.2d 1213, 1220 (Pa. Super. Ct. 1994). "Before the theory may be submitted to a jury, the defendant must produce evidence that the plaintiff fully understood the specific risk, and yet voluntarily chose to encounter it." Robinson, 664 A.2d at 618.

The parties' disagreement here is over the nature of the risk that defendant claims plaintiff assumed. Defendant contends that the risk was the kickstand, which was damaged and had a tendency to retract more easily than intended in the product's design. Plaintiff alleges that the defect was a design defect manifested in a bent spring that prevented the stand from staying in place when he deployed the kickstand. He contends that he did not know about this particular defect before the injury occurred.

The court agrees with the plaintiff that he lacked the subjective knowledge necessary for the assumption of risk defense to apply. Plaintiff was aware that the kickstand was malfunctioning before his accident, and had even attempted to have it fixed, but he was not aware of the defect that caused the stand to retract and did not know when that product failure would occur. As evidenced by the fact that even factory-authorized mechanics could not repair the vehicle, the record does not demonstrate that plaintiff had a subjective knowledge of the cause of the dangerous

condition of the motorcycle.  Plaintiff did not know what caused the stand to retract, and did not know when the dangerous condition would occur.  He therefore lacked subjective knowledge of the specific risk he faced.  The court will deny the motion on these grounds.

### ii. Plaintiff's Use was not as Intended

Defendant next argues that plaintiff did not use the jiffy stand for its intended purpose.  The part was broken, and had a damaged and bent part.  A manufacturer does not intend its parts to be used in a damaged condition, and plaintiff therefore used the stand for a purpose for which it was not designed.  Such unintended use bars the imposition of strict liability.

In Pennsylvania, "the general rule is that there is no strict liability . . . relative to non-intended uses even where foreseeable by a manufacturer."  <u>Pennsylvania Department of General Services v. United States Mineral Products Company</u>, 898 A.2d 590, 600 (Pa. 2006).  Thus, "[t]he seller is not liable if a safe product is made unsafe by subsequent changes."  <u>Davis v. Berwind Corp.</u>, 690 A.2d 186, 190 (Pa. 1997).  If a user makes a "substantial change" to the product, "the question becomes whether the manufacturer could have reasonably expected or foreseen such an alteration of its product."  <u>Id.</u>

The intended use of the jiffy stand is to hold the motorcycle up when parked.  The accident occurred when plaintiff attempted to use the jiffy stand while parking the motorcycle.  The accident therefore occurred when plaintiff was using the jiffy

stand for its intended purpose. The mere fact that the stand did not work as intended does not mean that the use was an unintended one. Indeed, the injury occurred because the jiffy stand did not work as designed and the motorcycle, which was supposed to remain standing when the device was deployed, fell over. The court will therefore deny summary judgment on these grounds.

Moreover, defendant's argument in part seems to be that plaintiff was negligent and careless in not seeking to repair the motorcycle before setting the kickstand. In Pennsylvania, however, "a plaintiff cannot be precluded from recovery in a products liability case because of his or her own negligence." Robinson, 664 A.2d at 618. Thus, "contributory negligence is not a defense in a products liability action." Id. The question here is whether there was a design defect, not whether plaintiff was careless in not having that defectively designed stand repaired before using the device for its intended purpose. Id. (finding that "contributory negligence may involve a plaintiff exposing himself to a danger of which he was subjectively unaware but which would have been apparent had he used due care.").

### iii. Condition of the Motorcycle had Changed

Defendant further contends that the condition of the motorcycle had changed since originally delivered from the manufacturer. The motorcycle was damaged on the undercarriage, and this damage may have bent the jiffy stand spring attachment point. As such, no strict liability claim is possible on a vehicle where parts are worn and damaged. The plaintiff cannot prove defendant's design, and not the

11

intervening defect, was the problem.

Under Pennsylvania law, "a manufacturer or seller is not liable for injuries caused by a defective product if the defect was created by a substantial alternation in the product amounting to a supervening or intervening cause of the plaintiff's injuries." Davis v. Berwind Corp., 640 A.2d 1289, 1297 (Pa. Super. Ct. 1994). "Where the product has reached the user or consumer with substantial change, the question becomes whether the manufacturer could have reasonably expected or foreseen such an alteration of its product." Davis, 690 A.2d at 190. Courts have applied this rule to circumstances where a plaintiff acted to change the way a device operated or to remove safety controls. See, e.g., Thompson v. Motch & Merryweather Machinery Co., 516 A.2d 1226, 1229 (Pa. Super. Ct. 1986) (defendant could not be liable for injuries caused by a power press when press was altered by owner to place operator's hands in a dangerous position); Brantner v. Black & Decker Mfg. Co., 831 F.Supp. 454, 460 (W. D. Pa. 1993) (alteration to drill meant that liability could not apply); Fisher v. Walsh Parts & Serv. Co., 296 F. Supp. 2d 551, 565 (E.D. Pa. 2003) (alteration to safety device on press eliminates liability for design defect); Smith v. Hobart Manufacturing Group, 302 F.2d 570, 573 (3d Cir. 1962) (removing the guard from a meat grinder to increase output was a substantial alteration); Speyer, Inc.v. Humble Oil & Refining Co., 403 F.2d 766, 771 (3d Cir. 1968) (altering gas pump by adding a new house meant that pump manufacturer could not be liable); Hanlon v. Cyril Bath Company, 541 F.2d 343, 345 (3d Cir. 1975)

12

(substitution of a new starting mechanism on press for the one that had been shipped with the product was substantial alteration).

The situation is different here. The evidence indicates that the locking pin on the undercarriage of the motorcycle became bent. This does amount to a change in the condition of the motorcycle after defendant shipped it. Plaintiff, however, took no action to alter the condition of the motorcycle like the plaintiffs in the above-cited cases had. Plaintiff's theory of liability is that the pin became bent in the normal operation of the motorcycle, making the stand dangerous. This change in condition was a result of a design flaw that exposed the pin and made it susceptible to bending. The bending was allegedly the second in a series of events that led to the untimely retraction of the stand. That series began, according to the plaintiff's expert, when Harley-Davidson designed a stand locked in place by a pin that could too easily become bent through normal use. There was no alteration of the product before the design defect made the stand unsafe, and thus a jury could reasonably find for the plaintiff under these circumstances. The court will therefore deny summary judgment on these grounds.

### iv. The Motorcycle is not Unreasonably Dangerous

Finally, defendant contends that the product in question, a 1992 Harley-Davidson Sportster motorcycle is not unreasonably dangerous when measured by the applicable risk-utility analysis. As such, plaintiff is entitled to summary judgment on plaintiff's products liability claim.

Courts in Pennsylvania have found that "strict liability allows recovery when a defective product that is 'unreasonably dangerous' causes harm to a user or consumer." Moyer v. United Dominion Indus., 473 F.3d 532, 538 (3d Cir. 2006) (citing Phillips v. A-Best Prods. Co., 665 A.2d 1167, 1170 (Pa. 1995)). The decision of whether a product is unreasonably dangerous is a question of law, and thus left to the court rather than to the jury. Id. Therefore, "in a strict product liability action, before the case can be placed before the jury, the judge must make a threshold determination whether the defect alleged, if proven, would render the product 'unreasonably dangerous" as the term is defined in the Restatement (Second) of Torts § 402A." Barker v. Deere & Co., 60 F.3d 158, 166 (3d Cir. 1995). To do so, a court must "'engage in a risk-utility analysis, weighing a product's harms against its social utility.'" Id. (quoting Surace v. Caterpillar, Inc., 111 F.3d 1039, 1044 (3d Cir. 1997)). A number of factors are relevant to this analysis:

> (1) The usefulness and desirability of the product–its utility to the user and to the public as a whole; (2) The safety aspects of the product–the likelihood that it will cause injury, and the probable seriousness of the injury; (3) The availability of a substitute product which would meet the same need and not be as unsafe; (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility; (5) The user's ability to avoid danger by the exercise of care in the use of the product; (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instruction; and (7) The feasibility, on the part of the manufacturer, of spreading the loss of [sic] setting the price of the product or carrying liability insurance.

Id. (quoting Surace, 111 F.3d at 1046).

In making this determination, "'the court must first view the evidence in the light most

14

favorable to the plaintiff.'" <u>Barker</u>, 60 F.3d at 166 (quoting <u>Burch v. Sears, Roebuck</u> <u>and Co.</u>, 467 A.2d 615, 618-19 (Pa. Super. Ct. 1983)). The court will address each of these factors in turn.

### i. Usefulness of Product

The parties disagree about whether the court should focus on the motorcycles as the product in question or the kick stand that was part of the motorcycle that fell on plaintiff. The defendant argues that the product in question is the motorcycle, and that by providing convenient and efficient transportation, those products have a utility to the public. The public also uses motorcycles for recreation and enjoyment, and governments have recognized the desirability of motorcycles by regulating and licensing the ownership of such vehicles. The particular motorcycle at issue here had been on the road since 1992, demonstrating that the various owners found the product useful and desirable. Plaintiff contends that the product in question here is the jiffy stand kickstand for the motorcycle, and that defendant has offered no reason why this particular design of kickstand is of particular utility to the public.

The court finds that the product in question has a utility to the particular user and the public as a whole, whether that product is a motorcycle or a kickstand for the motorcycle. Many Americans ride motorcycles, and they provide convenient and efficient travel. Motorcycles also provide recreation for many users. Of course, a motorcycle could hardly serve its intended purpose if a user could not park the (typically) two-wheeled vehicle. The stand–here the "jiffy stand"–allows the user to

15

dismount from the vehicle without having the bike topple over, potentially damaging both property and person. As designed, the "jiffy stand" is meant to provide an easy way for the rider to park the machine, dismount and leave the motorcycle standing. Thus, whether the product is the motorcycle or the kickstand, that product has public utility.

### ii. The Safety Aspects of the Product

The defendant argues it produced more than 150,000 Sportster motorcycles between 1989 and 1999, and that plaintiff's is the only complaint of injury, death or lawsuit related to an unexpected or unintentional movement of the jiffy stand into the stowed position. Moreover, the plaintiff reported no problems with the stand on his motorcycle for most of the time he owned it, even after the spring attachment point became bent. Plaintiff thus has insufficient evidence to show a significant risk of accidents from the collapse of the jiffy stand. In addition, the stand as designed meets federal and professional requirements for safety. As such, the product as designed does not represent an unreasonable risk.

Plaintiff offers the expert report of Michael D. Leshner, P.E. (See Report of Micheal D. Leshner, Exh. A to Affidavit in Opposition to Defendant's Motion for Summary Judgment (Doc. 45) (hereinafter "Leshner Report")). Leshner is a mechanical engineer with a bachelor of science degree from the Newark College of Engineering and graduate training at Princeton University. (Id.). He has more than forty years of experience in engineering, largely in internal combustion engines.

16

(Id.).  Since 1997, he has been a principal in Leshner & Associates, a forensic engineering firm.  (Id.).  Beyond numerous publications on the operation of engines and 16 patents for engine components, Leshner is a member of numerous professional organizations, including the Society of Automotive Engineers.  (Id.).  Leshner examined documents related to the case, including plaintiff's deposition and the defendant's answers to interrogatories.  (Id. at 1).  He also examined the specifications for the jiffy stand here at issue and the motorcycle in question.  (Id. at 1-2).  Leschner's inspection revealed that a pin connecting a spring to the stand assembly had been bent towards the rear of the motorcycle.  (Id. at 7).  With the pin in this condition, "there is no spring force to maintain the side stand in the deployed position," and the stand would tend to snap rearward without warning whenever the motorcycle's weight was not on the stand.  (Id.).  Leshner also found that the pin in question "is located at the lowest point in the frame and is subject to impact with road debris."  (Id.).  Because of the pin's location on the bottom of the motorcycle's frame, a rider cannot see such damage.  (Id.).  The bent pin caused the stand to malfunction and pop up into the stowed position unexpectedly.  (Id.).

In the end, Leshner concludes that "the subject motorcycle is defective in design with regard to its side stand and associated spring and spring retainer."  (Id. at 11).  Placing the spring retainer pin below the frame makes that pin "susceptible to becoming damaged."  (Id.).  If the pin becomes bent, the stand no longer functions properly.  (Id.).  This defect is dangerous, as the side stand can move unexpectedly

17

into the stowed position when the pin is bent, and such unexpected stowing of the side stand can cause the motorcycle to fall over when a rider attempts to return the motorcycle to a parked position after setting it upright, as plaintiff did here. (Id.). The rider would expect the stand to remain deployed when returning the motorcycle to the leaning (parked) position, and could fall over beneath the machine. (Id.).

Viewing the evidence in the light most favorable to the plaintiff, the court finds that this factor weighs in the plaintiff's favor. There is evidence that the design of the side stand was defective, exposing that stand to damage which would cause it to become unsafe. If damage occurred to the pin, as it did here, the stand would no longer stay deployed when the motorcycle's weight was not rested on it. This was not the way the stand was supposed to operate, and it created a danger that an operator would mistakenly believe the side stand was in place, resulting in an accident like the one here.

### iii. Availability of a Substitute that Would Meet the Same Need and Be More Safe

Defendant argues that plaintiff has not offered a substitute stand that would retract less easily, but simply asserts that a safer product exists. Combined with the fact that plaintiff's stand had a damaged and bent spring attachment point, plaintiff has not offered sufficient evidence that another design is available which could work as well. Plaintiff responds that his expert report details alternative designs which would be less likely to expose the spring attachment to damage and thus prevent

unintended retraction of the stand.  The court finds that this factor weighs in the plaintiff's favor.   Viewing the evidence in the light most favorable to the plaintiff, the court concludes that the plaintiff's expert has proposed a safer alternative design that would serve the same need of holding up the motorcycle when parked. Plaintiff's expert report identifies several design alternatives that the expert claims would prevent the spring from bending or eliminate its use altogether.  (Id. at 7-8). Using such an alternative design would decrease the likelihood of an unexpected retraction of the stand and thus make the motorcycle safer.  (Id. at 8).

### iv.  Ability to Eliminate Unsafe Characteristic of the Product without Impairing the Usefulness or Raising the Costs

Defendant insists that the stand's design is safe and that there is no reason to alter the stand's design because no evidence of other accidents related to the alleged flaw exist.  Under those circumstances, defendant claims, courts have found that this factor need not be addressed.  Moreover, plaintiff has simply proposed that a design from another motorcycle be adopted, without providing any evidence that it could.  Plaintiff disputes defendant's claim that no other accidents have occurred and that a change in the design would not be feasible.

The court finds that this factor too weighs in the plaintiff's favor.  Plaintiff's expert proposes an alternative design based on kickstands used on other Harley-Davidson motorcycles.  (Id. at 7).  Instead of using a pin to retain the side stand spring, Leshner found, some Harley-Davidson models used a steel bracket, which

better protected the position of the spring and could be much more easily replaced than the pin welded to the motorcycle frame. (Id. at 7-8). This design serves the same purpose as the pin, but "eliminates susceptibility to damage without introducing any adverse effects on utility, cost, manufacturability or function." (Id. at 10). Plaintiff thus has evidence that a safer alternative design exists. This design, which was used on other Harley-Davidson models, would also be feasible in terms of costs and ease of manufacture.

### v. User's Ability to Avoid Danger by Exercising Care in Use of Product

Defendant argues that plaintiff was aware that the side stand was malfunctioning before the accident occurred, and that any user aware of the problem with the stand could avoid any danger by exercising due care. Indeed, plaintiff had made plans to have the stand repaired. Because plaintiff could have avoiding danger by acting on his knowledge of the malfunctioning stand, this factor should weigh in defendant's favor. Plaintiff responds that he never noticed the bent spring attachment on the stand, but that he acted prudently in an attempt to investigate why his stand had begun behaving unpredictably. In any case, as long as plaintiff used the motorcycle, he had to use the jiffy stand and relied on it when he parked the motorcycle or got off it after riding. According to plaintiff's expert, the jiffy stand with a bent spring would retract if the rider shifted weight from one side of the bike to the other. Since plaintiff could not dismount from the motorcycle without shifting his

weight, the malfunctioning stand made use of the vehicle impossible without risk of the stand collapsing and the motorcycle injuring plaintiff.

The court finds that this factor weighs in the plaintiff's favor as well. Due to a design defect, the stand was not functioning properly. In order to park the bike, however, plaintiff needed to use the stand. Moreover, getting on and off a motorcycle requires shifting weight and tipping and leaning the vehicle. The motorcycle tipped over and injured the plaintiff when he leaned it to one sign in a prelude to dismounting. In any case, "[t]he proper focus in applying the fifth . . . factor then is an objective inquiry into whether the class of ordinary purchasers of the product could avoid injury through the exercise of care in use of the product, not whether this particular plaintiff could have avoided this particular injury." Surace, 111 F.3d at 1051. The design defect creates the danger that the stand will retract at an unexpected time, causing the motorcycle to topple over. Examining the product would not necessarily reveal that the pin was bent and a danger, and thus a user would not be prepared for a sudden retraction. An ordinary purchaser of a motorcycle would not think it necessary to assume that the kickstand could retract unexpectedly, and thus a user of the product could not avoid the injury through exercise of due care.

> **vi.** **The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the**

21

**existence of suitable warnings or instruction**

Defendant argues that plaintiff admitted that he was aware of the danger posed by the stand which failed to retract. Common knowledge would inform plaintiff of the danger to his safety of a motorcycle which could not stand up. Plaintiff argues that he and other riders of motorcycles would not necessarily know to recognize a bent spring attachment, nor understand the danger of unexpected retraction that such a spring posed.

The court finds that this factor weighs in the plaintiff's favor as well. Viewing the evidence in the light most favorable to the plaintiff, the court finds that the cause of the problem with the stand was not easy to recognize and thus collapse was difficult to prevent or predict. A rider could know that the motorcycle was not standing as designed, but would not necessarily know why that problem existed or how to prevent or predict the collapse.

### vii. Feasibility of Spreading the Loss of Making Design Changes

Defendant does not offer any substantive argument on this issue, but instead contends that the other six factors favor the defendant, and no need to address this final factor therefore exists. Plaintiff insists that there would be little cost to the defendant for fixing the offending product, and that cost could easily be minimized by liability insurance or raising the product price. Plaintiff also contends that the design fixes he has proposed would not increase the cost of product or the consumer's purchase price.

This factor too weighs in the plaintiff's favor. According to plaintiff's expert, the design flaw which allowed the spring to become bent through ordinary use could be remedied with a fairly simple and low-cost fix that has been used on other Harley-Davidson motorcylces. (Report at 10). Defendant offers no evidence to counter this claim, and the court thus finds that it weighs in plaintiff's favor.

The court therefore finds that the factors weigh in the plaintiff's favor. If proved to a jury, this evidence would lead a jury to conclude that the product in question is unreasonably dangerous under Pennsylvania law. This products liability claim should go forward.

**Conclusion**

For the reasons stated above, the court will deny the defendant's motion. An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RUSSELL BATTIATO,** | : | **No. 1:08cv1786** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **HARLEY-DAVIDSON MOTOR** | : | |
| **COMPANY;** | : | |
| **JOHN DOES 1-10;** | : | |
| **ABC CORPORATIONS 1-10;** | : | |
| **DEF COMPANIES; and** | : | |
| **XYZ PARTNERSHIPS** | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

**ORDER**

**AND NOW**, to wit, this 24th day of June 2010, Defendant Harley-Davidson's motion for summary judgment (Doc. 40) is hereby **DENIED**.

**BY THE COURT:**

**s/ James M. Munley**
**JUDGE JAMES M. MUNLEY**
**UNITED STATES DISTRICT COURT**